UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILLIAM AIELLO, by and through his Guardian ad Litem, KAREN AIELLO, and KAREN AIELLO, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>FKI INDUSTRIES, INC., dba AMERICAN CHAIN COMPANY; THE CROSBY GROUP, INC.; COLUMBUS McKINNON CORPORATION dba DIXIE INDUSTRIES; and COOPER INDUSTRIES, INC. dba COOPER TOOLS, CAMPBELL DIVISION; and DURABILT DYVEX, INC.,<br><br>Defendants. | No. C04-2552Z<br><br>ORDER |

This matter comes before the Court on Defendants' Joint Motion for Summary Judgment, docket no. 50. Having considered the parties' briefs, declarations, and exhibits, and the oral argument of counsel on September 12, 2006, the Court now GRANTS the motion.

## I. BACKGROUND

### A. November 12, 2001 Accident

As an employee of Mergenthaler Transfer & Storage ("Mergenthaler"), Plaintiff William Aiello regularly delivered empty reels used to haul wire from his employer in

ORDER -1-

Portland, Oregon, to Mergenthaler's customer, Verizon, in Everett, Washington. Barcus Aff., docket no. 66-5, ¶¶ 3, 5; Mendonca Aff., docket no. 66-3, ¶ 6; Zanto Decl., docket no. 51, ¶ 1. Upon arrival, Mr. Aiello would unchain the reels, which were secured to his trailer with "load binders." Barcus Aff. ¶¶ 4, 7. Load binders take up slack and secure chain around loads. Fries Decl., docket no. 66-2, ¶ 7. After the empty reels were unloaded and the full reels loaded for the return trip, Mr. Aiello would hook the chains through the reels and "bind down his load" with load binders. Barcus Aff. ¶ 6.

On November 12, 2001, Mr. Aiello drove the Mergenthaler "M-44" trailer to Verizon. After he arrived at Verizon to unchain his reels, a Verizon employee, Thomas Barcus, discovered Mr. Aiello injured and lying on the ground underneath his truck. Id. ¶¶ 10-12, 16. Mr. Barcus believes that "Mr. Aiello had been hit by the load binder when it popped open with excessive force." Barcus Aff. ¶ 15. There were no witnesses to the accident. Brubaker Decl., docket no. 53, Ex. B (Zanto) at 10; Zanto Decl. ¶ 4. Mr. Aiello has no recollection of the accident. Brubaker Decl., Ex. B (K. Aiello) at 10; Fries Decl. ¶ 3. For the purposes of this motion, Defendants do not dispute that "Mr. Aiello's injuries were caused by a load binder." Defs.' Mot. Summ. J. at 3 n.4. Plaintiffs allege that, as a result of the accident, Mr. Aiello lost an eye and suffered traumatic brain injury, among other injuries. Am. Compl., docket no. 34, ¶ 5.1. Later that day, Dan Mendonca, a replacement driver, was dispatched from Mergenthaler's Kent, Washington terminal to Verizon's facilities to pick up Mr. Aiello's trailer and return it to Portland. Zanto Decl. ¶ 5; Mendonca Aff. ¶¶ 3-4.

**B.    The Load Binder Involved in the Accident**

According to Mr. Barcus, the Verizon employee who discovered Mr. Aiello, the load binder that injured Mr. Aiello was not bent or broken, and there was no reason it could not be used again. Barcus Aff. ¶ 18. Mr. Barcus testifies that "[t]he load binder that injured Mr. Aiello was placed back on the trailer, or in the box that held the chain binders on the side of the truck." Id. ¶ 17. Mr. Barcus admits, however, that he did not personally observe the

placement of the load binder back on the trailer following the accident.  Suppl. Brubaker Decl., docket no. 73-2, Ex. A (Barcus Dep.) at 107-08.

When Mr. Mendonca, the replacement driver who picked up Mr. Aiello's trailer, arrived at Verizon, the empty reels had been taken off the trailer and new reels with wire had been loaded onto the trailer.  Mendonca Aff. ¶ 6.  Mr. Mendonca chained down the reels with load binders that were on the trailer or in a side bin.  Id. ¶¶ 6, 8.  Mr. Mendonca "did return all the load binders to the side bin upon completion of the job upon any return to Portland, or left them on the side of the trailer."  Id. ¶ 15.

According to Lance Zanto, Mergenthaler's Vice President of Safety and Compliance, no one at Mergenthaler gave any instructions relating to the load binders or any other equipment on Mr. Aiello's trailer.  Zanto Decl. ¶ 5.  In particular, no one asked the replacement driver to preserve the specific load binder involved in the accident or to set aside any or all of the load binders on the trailer that day.  Id.  Mr. Zanto does not know if the load binder that may have injured Mr. Aiello was put back on Mr. Aiello's trailer in Everett, Washington, or if the load binder was returned with Mr. Aiello's trailer or any other Mergenthaler trailer to Portland.  Id. ¶ 7.

**C.     Load Binders on Mr. Aiello's "M-44" Trailer**

Neither party has submitted any evidence identifying which load binders were present on the M-44 trailer on the day of the accident.  "Mergenthaler has no records from which it could determine which load binders were on the trailer M-44 on November 12, 2001."  Zanto Decl. ¶ 11.

On March 11, 2004, Plaintiffs' expert, Thomas R. Fries, inspected and photographed twelve load binders on the M-44 trailer in Portland.  Fries Decl. ¶ 6.A.  At the time the lawsuit was filed, Mr. Fries had identified the manufacturers of eight of the twelve load binders that were contained in the box on the side of the truck during the inspection on March 11, 2004.  Dummigan Decl., docket no. 66-6, ¶ 7.  Through further investigation, Mr.

1 Fries was later able to identify the manufacturers of the additional four load binders. Id. ¶ 8.[1]
2 Mr. Fries now opines "that the twelve chain binders that [he] examined on March 11, 2004
3 on Mergenthaler Trailer (M-44) were manufactured by . . . The Crosby Group . . . Columbus
4 McKinnon Corp. . . . Cooper Industries, Inc. . . . FKI Industries, Inc. . . . Durabilt Dyvex,
5 Inc." Fries Decl. ¶ 10.A.-F. Plaintiffs have named these five entities as Defendants in their
6 Amended Complaint.

7 This case hinges on whether the load binders inspected by Mr. Fries on March 11,
8 2004 were the same as those present on Mr. Aiello's trailer on the day of the accident.
9 "Mergenthaler has no records from which it could determine if the load binders on trailer M-
10 44 on November 12, 2001 were the same as those inspected by [Mr.] Aiello's representatives
11 on March 11, 2004." Zanto Decl. ¶ 12. "Given the occasional swapping and replacement of
12 load binders on Mergenthaler trailers," Mr. Zanto testifies that he "cannot be sure that all of
13 the load binders that could have been on trailer M-44 on November 12, 2001 would still be
14 on trailer M-44 at the time of the March 11, 2004 inspection." Id. Plaintiffs have submitted
15 the declaration of Mr. Mendonca, who testifies that: "To my knowledge, none of the load
16 binders were changed on this particular trailer during the period of time following this
17 incident, although I did not drive this trailer on a regular basis." Mendonca Aff. ¶ 15.

18 **D.     General Practices of Mergenthaler Regarding Replacement of Load**
19 **Binders**

20 Several Mergenthaler employees have testified about the general practices of
21 Mergenthaler regarding the replacement of load binders over time. Mr. Mendonca testifies
22 that "[e]ach trailer is supposed to be equipped with a certain number of load binders;" that
23 "[i]f a load binder was damaged or no longer worked, it would be replaced with a new load
24 binder according to Mergenthaler's policy;" and that "[a]lthough on rare occasions a load

---

[1] According to Mr. Fries, Durabilt Dyvex, Inc. manufactured three of the previously unidentified load binders, and Columbus McKinnon Corporation manufactured the other previously unidentified load binder. Fries Decl. ¶¶ 6.B., 10.E.-10.F.

ORDER   -4-

binder could be borrowed by a driver from another rig, it was the general practice to keep the same set of load binders on the same trailer." Mendonca Aff. ¶¶ 12, 13.

Another Mergenthaler truck driver, Kay Berry, testifies that "[t]he number of load binders in the box on a particular trailer was generally in the range of ten to fourteen;" that "[t]he load binders on any particular trailer would not be replaced or removed, unless they had become damaged or destroyed;" that "they would be replaced by a new load binder;" and that "load binders were rarely if ever determined to be damaged or destroyed by Mergenthaler." Berry Aff., docket no. 66-4, ¶¶ 15, 16.

Mr. Zanto of Mergenthaler testifies that "[t]he number of load binders on any given trailer changes over time, depending on the load being hauled and the driver's needs;" that "[d]rivers occasionally take load binders off of other Mergenthaler trailers or from supplies at the terminal if the trailer they are driving that day does not have enough load binders to secure the load;" that "if a driver or terminal manager determines that a particular load binder is not working or appears worn, they replace it with another load binder and remove the worn binder from service." Zanto Decl. ¶ 9. He further explains that "[t]here is no central system for purchasing or tracking the load binders used on Mergenthaler trailers;" that "Mergenthaler does not maintain an inventory of load binders;" and that "Mergenthaler terminal managers and drivers purchase load binders as needed from a variety of sources, including truck stops, trailer dealers, and equipment suppliers." Id. ¶ 10.

E.  **Original Complaint**

On November 5, 2004, Mr. Aiello, an Oregon resident, filed a complaint in state court (Snohomish County), alleging a "market-share alternate strict liability" claim and an "alternate liability-negligence" claim. Compl., docket no. 1, ¶¶ 4.1-4.9, 5.1, 6.1-6.3. In addition, his wife, Karen Aiello, who is also an Oregon resident, alleged a loss of consortium claim. Id. ¶¶ 1.2, 7.1. The Complaint alleged that Defendants are "engaged in the business of designing, manufacturing, testing, distributing, and selling lever-type load binders." Id. ¶¶

ORDER -5-

2.3, 2.6, 2.8, 2.10. On December 29, 2004, Defendants removed the case to federal court. Joint Notice of Removal, docket no. 1.

### F. Prior Motion to Dismiss Under FED. R. CIV. P. 12(b)(6)

On January 25, 2005, Defendants jointly moved to dismiss Plaintiffs' claims pursuant to FED. R. CIV. P. 12(b)(6). Defs.' Mot. Dismiss, docket no. 11. At that time, Plaintiffs had identified manufacturers for only eight of the twelve load binders inspected on March 11, 2004. Defendants' motion to dismiss argued that Plaintiffs could not invoke the alternate liability theory because Plaintiffs had not joined all possible tortfeasors. Defs.' Mot. Dismiss at 8-9. Defendants also argued that "[i]t is pure speculation to believe that the same load binder that is alleged to have struck Mr. Aiello remained on the trailer some two years and four months later" (i.e., on March 11, 2004, when Plaintiffs first inspected the load binders on Mr. Aiello's trailer). Id. at 9.

On April 11, 2005, the Court granted in part and denied in part Defendants' Joint Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). Order, docket no. 27, at 2.[2] The Court granted the motion as to Plaintiffs' market share alternate-strict liability claim and dismissed that claim. Id. The Court denied the motion as to Plaintiffs' alternate liability claim and permitted Plaintiffs "to engage in further discovery related to this claim." Id. The Court further denied the motion as to Mrs. Aiello's loss of consortium claim, and ordered that "Plaintiffs will be permitted to pursue this claim only under their alternate liability-negligence theory." Id.

### G. Amended Complaint

On August 31, 2005, Plaintiffs filed an Amended Complaint, which alleges two claims: (1) Mr. Aiello's alternate liability-negligence claim, and (2) Mrs. Aiello's loss of consortium claim. Am. Compl. ¶¶ 4.1-4.9, 5.1-5.3, 6.1. Plaintiffs also added Durabilt

---

[2] In contrast to Defendants' summary judgment motion, no choice of law issues were presented in Defendants' motion to dismiss, and the Court applied Washington law.

ORDER -6-

Dyvex, Inc. as a defendant in the Amended Complaint. Id. ¶¶ 2.9, 2.10.

### H. Present Motion

Defendants jointly move for summary judgment on Plaintiffs' alternate liability-negligence and loss of consortium claims. First, Defendants move for the application of Oregon law, under which no alternate liability-negligence claim exists. Second, Defendants argue that even if Washington law applies, alternate liability-negligence is no longer a viable cause of action because Washington has, by statute, severely limited joint and several liability. Third, Defendants argue that even if an alternate liability-negligence claim is available in Washington, Plaintiffs cannot raise a genuine issue of material fact to defeat summary judgment.

## II. DISCUSSION

### A. Choice of Law Analysis

Defendants move for the application of Oregon law, and Plaintiffs respond that Washington law should be applied.[3] This is a diversity action under 28 U.S.C. § 1332. "Federal courts sitting in diversity must apply the forum state's choice of law rules to determine the controlling substantive law." Fields v. Legacy Health Sys., 413 F.3d 943, 950 (9th Cir. 2005). Because this suit was filed in the Western District of Washington, the Court should apply Washington's choice of law rules.

#### 1. Actual Conflict

In Washington, the "presumptive local law" applies unless there is "an actual conflict between the laws or interests of Washington and the laws or interests of another state." Seizer v. Sessions, 132 Wn.2d 642, 648-49 (1997). Oregon does not recognize an "alternative liability"[4] cause of action. Senn v. Merrell Dow Pharms., Inc., 305 Or. 256, 271

---

[3] Neither side argues that the law of the states in which the load binders were manufactured should apply.

[4] Courts use the terms "alternative liability" and "alternate liability" interchangeably.

ORDER -7-

(1988) (holding the theory to be inconsistent with common law principles of tort liability).[5] In contrast, Washington courts have recognized, but have not yet applied, the theory of "alternate liability." Martin v. Abbott Labs., 102 Wn.2d 581, 591 (1984) (citing Clift v. Nelson, 25 Wn.App. 607 (1980) and Phennah v. Whalen, 28 Wn.App. 19 (1980)). Thus, there is an actual conflict between the laws of Washington and Oregon as to the existence of an alternate liability-negligence claim.

### 2. The "Most Significant Relationship" Test

Where an actual conflict of laws exists, the Court must determine which state's law to apply. To make this choice of law determination, the Court applies the "most significant relationship" test, as outlined in the Restatement (Second) of Conflict of Laws § 145 (1971). See Johnson v. Spider Staging Co., 87 Wn.2d 577, 580 (1976).

The first step in determining which state has the most significant relationship to the occurrence and the parties is to take into account the following contacts:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2).[6] "These contacts are to be evaluated according to their relative importance with respect to the particular issue" and are to be considered while applying the principles of the Restatement (Second) of Conflict of Laws § 6

---

[5] Oregon's rejection of the alternate liability theory is not disputed by the parties. See Defs.' Mot. Summ. J. at 9 ("Alternate negligence is not recognized as a cause of action in Oregon."); Pls.' Opp'n, docket no. 66-1, at 7 ("Oregon law does not recognize alternate liability-negligence claims.").

[6] The Court declines to consider contacts put forward by Defendants that are not part of the test, such as the fact that Mr. Aiello was employed in Oregon, that his home base for driving his trailer was Oregon, that his workers' compensation claim is in Oregon, and that Mergenthaler purchased load binders in Oregon. Defs.' Mot. Summ. J. at 9 n.8.

ORDER  -8-

(1971). Id. The Court's "approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found." Johnson, 87 Wn.2d at 581.

"In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146 (1971). In other words, "[a]lthough there is [a] presumption that in personal injury cases, the law of the place of the injury applies, this presumption is overcome if another state has a greater interest in [the] determination of a particular issue." Zenaida-Garcia v. Recovery Syss. Tech., Inc., 128 Wn.App. 256, 261-62 n.17 (2005); see also Martin v. Goodyear Tire & Rubber Co., 114 Wn.App. 823, 829-30 (2003).

If "the contacts are evenly balanced," the second step of the analysis is to consider "the interests and public policies" of the concerned states. Johnson, 87 Wn.2d at 582; see also Myers v. Boeing Co., 115 Wn.2d 123, 133 (1990). "The extent of the interest of each potentially interested state should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved." Southwell, 101 Wn.2d at 204; see also Zenaida-Garcia, 128 Wn.App. at 263-64.

Defendants make a belated[7] and meager attempt – in footnote 8 of their opening brief – to argue that Oregon law applies to this case. The first "place where the injury occurred" contact favors Washington because Mr. Aiello was injured at the Verizon facility in Everett, Washington. The second "place where the conduct causing the injury occurred" contact is neutral as to Oregon and Washington. In a products liability action, the "place where the

---

[7] Even though Defendants did not raise any conflict of law issue in their prior motion to dismiss, Plaintiffs do not argue that Defendants have somehow waived their right to raise the issue now.

ORDER   -9-

conduct causing the injury occurred" is the place where the defendant designed, manufactured, or was otherwise involved with the product in question. See Zenaida-Garcia, 128 Wn.App. at 263 n.20. There is no evidence in the record that any of the allegedly defective load binders were manufactured in Oregon or Washington, and it seems unlikely given that the five defendant manufacturers' principal places of business are located in Pennsylvania, Oklahoma, New York, Texas, and Illinois. See Am. Compl. ¶¶ 2.1, 2.3, 2.5, 2.7, 2.9; Defs.' Mot. Summ. J. at 9 n.8 (not contesting Plaintiffs' allegations as to Defendants' places of incorporation or principal places of business). The third "domiciles" contact favors Oregon, because Mr. and Mrs. Aiello are Oregon residents. Because the five defendant corporations are incorporated, and have their principal places of business, outside of Oregon and Washington, see id., their "residency" has no impact on the choice of law analysis as to Oregon or Washington.

Regarding the fourth "relationship" contact, Defendants raise an argument that the relationship of the parties was centered in Oregon. See Defs.' Reply, docket no. 67, at 5-6. The Court does not consider this argument because Defendants raise it for the first time in their reply brief, and Plaintiffs have not had an opportunity to respond. See Okanogan Highlands Alliance v. Williams, 236 F.3d 468, 478 n. 4 (9th Cir.2000) (declining to address argument raised for the first time in a reply brief). Even if the Court were to consider the argument, the Court would conclude that Mr. Aiello had a preexisting relationship with the load binder that was centered in both Oregon and Washington because he used the load binder in both states on his regular trips back and forth between the two states. See Martin v. Goodyear Tire & Rubber Co., 114 Wn.App. at 832 (discussing the absence of any preexisting relationship between the plaintiff and the defective product); Szymaszek v. Subaru of America, Inc., Case No. C05-1968RSL, 2006 U.S. Dist. LEXIS 35007, at *7-8 (W.D. Wash. May 30, 2006) (discussing the presence of a preexisting relationship between the plaintiff and the defective product). Thus, this fourth contact is neutral.

ORDER  -10-

Only two of the four "contacts" have any bearing on the choice of law analysis, with the first "place of injury" contact favoring Washington and the third "residency" contact favoring Oregon. The Washington Supreme Court has stated that "residency in the forum state alone has not been considered a sufficient relation to the action to warrant application of forum law." Rice v. Dow Chem. Co., 124 Wn.2d 205, 216 (1994). As a result, the Court concludes that the first "place of injury" contact favoring Washington outweighs the third "residency" contact, which only weakly favors Oregon, and, thus, Washington has the most significant relationship to the occurrence and the parties.

Because the contacts are not "evenly balanced," the Court does not need to reach the second "interests" prong of the choice of law analysis. In any case, Defendants do not assert that Oregon's interests outweigh Washington's interests in the determination of liability in this case. See Defs.' Reply at 6-7. In light of the presumption in personal injury cases that the law where the injury occurred will apply unless another state has a greater interest, the Court applies Washington law.

**B.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Anderson, 477 U.S. at 255.

**C.    Availability of Alternate Liability in Washington**

"Alternate liability has been recognized, but not as of yet applied in [Washington] state." Martin v. Abbott Labs., 102 Wn.2d 581 (1984) (citing Clift v. Nelson, 25 Wn.App. 607 (1980); Phennah v. Whalen, 28 Wn.App. 19 (1980)). These cases pre-date the 1986 Tort Reform Act, which severely limited joint and several liability in Washington. See RCW

ORDER   -11-

4.22.070 ("The liability of each defendant shall be several only and shall not be joint . . . "). Defendants argue that post-tort reform, Washington courts would not recognize an alternate liability claim.

"[T]he concept of joint and several liability underlies the concept of alternative liability delineated in [Summers v. Tice, 33 Cal.2d 80, 88 (1949)]." Napier v. Osmose, 399 F.Supp.2d 811, 819 (W.D. Mich. 2005) (quoting Doe v. Cutter Biological, 852 F.Supp. 909, 918 (D. Idaho 1994)). In an alternate liability case, harm has been caused to the plaintiff by only one defendant, but there is uncertainty as to which one caused it. Restatement (Second) of Torts, § 433B (1965). Defendants who are unable to prove that they have not caused the harm are held jointly and severally liable. Martin v. Abbott Labs., 102 Wn.2d at 591; see also Summers, 33 Cal.2d at 88 ("[E]ach defendant is liable for the whole damage whether they are deemed to be acting in concert or independently.").[8]

With these principles in mind, federal courts in Michigan and Idaho have held that there is no alternate liability once a state has abolished joint and several liability. See Napier, 399 F.Supp.2d at 820; Doe v. Cutter Biological, 852 F.Supp. at 917-18. The Doe court explained its holding as follows: "[G]iven the recognition that the theory of alternative liability set forth in Summers v. Tice involves joint and several liability, and given that the Idaho Supreme Court fully acknowledges that the Idaho legislature abolished joint and several liability when it enacted Idaho Code § 6-803(3), existing Idaho law precludes the endorsement of alternative liability theories." Doe, 852 F.Supp. at 918. The Napier court noted that "Michigan's Court of Appeals has suggested that case law decided before tort reform cannot be used to 'rewrite' the statutes." Napier, 399 F.Supp.2d at 818. The Napier court concluded that "allowing an alternative liability theory to impose liability would

---

[8] Accordingly, the Court rejects Plaintiffs' position that proportionate liability can be applied to an alternate liability-negligence claim. "Under proportionate liability a negligent party is liable for his own proportionate share of fault and no more." Kottler v. State, 136 Wn.2d 437, 445 (1998) (citing Washburn v. Beatt Equip. Co., 120 Wn.2d 246, 294 (1992).

ORDER -12-

contradict the Michigan legislature's intent to bar joint and several liability *except where that body clearly expressed an intent to the contrary.*" Napier, 399 F.Supp.2d at 820 (emphasis added). Because none of the statutory exceptions to several liability applied in that case, the alternative liability theory did not apply. See id. at 817, 820.

This Court similarly concludes that Washington courts would only allow an alternate liability claim where the Washington State Legislature has expressed an intent not to bar joint and several liability. The only statutory exception to Washington's "several only" liability rule that could possibly apply in the present case is the "no fault" exception,[9] which provides:

> If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the [claimant's] total damages.

RCW 4.22.070(1)(b).[10] At oral argument, Defendants conceded that Washington courts would recognize an alternate liability claim where this exception applies. Thus, Mr. Aiello may pursue his alternate liability-negligence claim, but only if he can prove that he "was not at fault" pursuant to RCW 4.22.070(1)(b).

Defendants argue that "it appears unlikely that Mr. Aiello is entirely free from fault in his accident," and assert that "'cheater pipes' are regularly found on Mergenthaler trailers" (which might be indicative of Mr. Aiello's contributory fault). Defs.' Mot. Summ. J. at 11-12 n.10. However, Defendants submit no evidence that Mr. Aiello used a cheater pipe on the day of the accident. And Plaintiffs have presented evidence to the contrary. Barcus Aff. ¶ 15 ("I do not remember seeing a cheater bar in the area where Mr. Aiello was lying.");

---

[9] Plaintiffs have neither alleged nor argued that any other exception might apply here.

[10] The Court notes that "the sum of [defendants'] proportionate shares of the [claimant's] total damages" will be one hundred percent in an alternate liability case where the claimant is not at fault because it is known that the claimant's damages are caused by one defendant, but there is uncertainty as to which one. Thus, RCW 4.22.070(1)(b)'s reference to proportionate shares of damages does not preclude the application of an alternate liability theory.

ORDER   -13-

Mendonca Aff. ¶ 18 ("I did not see a cheater bar that day on the trailer, and do not know if William Aiello had utilized a cheater bar."). This evidence raises a genuine issue of material fact that Mr. Aiello was not at fault, precluding summary judgment on this basis. See FED. R. CIV. P. 56(c).

### D. Application of the Alternate Liability Theory to Present Case

The holding of Summers v. Tice was adopted in the Restatement (Second) of Torts, § 433B(3), which provides:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts, § 433B(3). "Under the rule, a defendant may be held liable even though its tortious actions did not actually cause the plaintiff's injuries." Kinnett v. Mass Gas & Elec. Supply Co., 716 F.Supp. 695, 698 (D.N.H. 1989). "The policy behind this dramatic exception to the causation requirement is the 'injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.'" Id. (quoting Restatement § 433B, comment f).

Under Washington law, a plaintiff asserting alternate liability must show: (1) that each defendant acted in a tortious manner; and (2) that all potential tortfeasors have been joined as defendants.[11] See Clift, 25 Wn.App. at 610 ("Before a plaintiff may rely on section 433B, he must show that each defendant acted in a tortious manner"); Martin v. Abbott Labs., 102

---

[11] Defendants identified two other "prerequisites" to an alternate liability claim: (1) that the failure to identify the individual tortfeasor must be due to defendants' negligence; and (2) that defendants' conduct must be simultaneous and similar. Defs.' Mot. Summ. J. at 13, 16-19. Some courts outside of Washington have applied these, or similar, prerequisites. This Court, however, declines to expand the elements of an alternate liability claim beyond the two elements discussed in Washington cases.

ORDER -14-

1  Wn.2d at 595 ("The alternate liability theory formulation contemplates that all tortious

2  defendants will be joined in the suit."). In <u>Clift</u>, the Washington Court of Appeals affirmed

3  summary judgment for the defendants regarding the plaintiff's alternate liability claim

4  because "the plaintiff has not produced any evidence of tortious conduct by these particular

5  defendants," and because there remained a possibility that the tortious act was committed by

6  a party not named as a defendant. <u>Clift</u>, 25 Wn.App. at 611. The <u>Clift</u> court reasoned that

7  "[t]o allow a judgment against an innocent defendant would be as great an injustice as

8  denying plaintiff a recovery." <u>Id.</u>

9           **1.**     **Tortious Conduct**

10      Plaintiffs' expert, Mr. Fries, has opined that the load binders manufactured by the

11  Defendants contain the same design defects. In section 5.A. of his report, he states: "The

12  over-center lever-type load binder is defective and unreasonably dangerous" because the

13  "design allows the load binders to open suddenly and with great force during routine

14  release;" because "[t]here is no locking device or other safety mechanism to prevent the

15  sudden and uncontrolled release of the load binders during foreseeable operation within its

16  working load limit;" and because the "design does not indicate the amount of stored energy,

17  within the mechanism. . . ." He further states: "All twelve over-center load binders that were

18  inspected on March 11, 2004 are defective and unreasonably dangerous as stated in [section]

19  5A" of his report. Fries Decl. ¶ 5.

20      Assuming, for the moment, that Plaintiffs could prove that the twelve allegedly

21  defective load binders that were inspected on March 11, 2004 were present on Mr. Aiello's

22  trailer on the day of the accident, the Court concludes that Mr. Fries Declaration is not

23  sufficient to raise a genuine issue of material fact that the defendants all committed "tortious

24  conduct" toward Mr. Aiello. One court has stated that "outside of the mass-tort context,

25  alternative liability theory does not allow a plaintiff to sue a manufacturer to whose product

26  plaintiff has not been exposed based on the fortuitous discovery that the product shares a

ORDER   -15-

common defect with other products of the same type." Kinnett, 716 F.Supp. at 700. In Kinnett, not all of the products were present at the scene of the accident. The Court concludes that the Fries report and opinion of a common defect, without more, fails to support a determination of tortious conduct as a matter of law. This Plaintiff fails to establish the tortious conduct element of this tort.

### 2. Joinder of All Potential Tortfeasors

"The alternate liability theory formulation contemplates that all tortious defendants will be joined in the suit." Martin v. Abbott Labs., 102 Wn.2d at 595. Defendants argue that Plaintiffs have failed to join all potential manufacturers[12] of load binders that could have been involved with Mr. Aiello's accident. "Plaintiffs agree that they must create a question of fact showing that they have joined all potential tortfeasors in order to proceed with an alternate liability-negligence claim." Pls.' Opp'n at 11.

Defendants argue that it is pure speculation that the load binders manufactured by Defendants were on Mr. Aiello's trailer on the day of the accident. Plaintiffs' allegation that "the load binders that the Plaintiffs' representatives inspected on the Mergenthaler trailer M-44 on March 11, 2004, were the same as those that were on the Mergenthaler trailer M-44 on the date of the incident, one of which caused plaintiff's injuries," Am. Compl. ¶ 4.8, is unsupported by any evidence. Even if the Court assumes that the Plaintiffs' expert, Mr. Fries, has correctly identified the manufacturers of the twelve load binders that were located on the M-44 trailer on March 11, 2004, Plaintiffs have failed to raise a genuine issue of material fact that all of those load binders were present on Mr. Aiello's trailer on the day of the accident. Plaintiffs assert that they have raised a genuine issue of material fact through

---

[12] Defendants also argue that Plaintiffs have failed to join any load binder distributor or seller who would also be liable, in addition to load binder manufacturers, under the Washington Products Liability Act. Specifically, a load binder seller whom Plaintiffs knew sold load binders to Mergenthaler – Rigging Products Inc. – was not joined. See Brubaker Decl. Ex. D (Rigging Products Inc. invoices to Mergenthaler for load binders). The Court does not reach the issue of whether or not Plaintiffs were required to join load binder distributors and sellers because of Plaintiffs' failure to join all potential manufacturer defendants.

ORDER   -16-

the testimony of Mr. Berry and Mr. Mendonca, who have testified that the load binders on any Mergenthaler trailer were rarely changed, unless they were damaged or destroyed, or if a driver borrowed a load binder from another rig.  See Berry Aff. ¶ 16; Mendonca Aff. ¶¶ 12, 13.  Any statement about the general practices of Mergenthaler or its drivers with respect to the general use and replacement of load binders is insufficient to raise a genuine issue of material fact concerning the composition of the load binders over time on Mr. Aiello's particular trailer.  Furthermore, the Affidavits of Mr. Berry and Mr. Mendonca admit that the composition of load binders did change over time if certain circumstances occurred.  No inference can be made from this testimony that the load binders on the M-44 trailer driven by Mr. Aiello on the day of the accident remained on the trailer two years and four months later, on the day of the inspection.

At oral argument, Plaintiffs relied on Mr. Mendonca's statement: "To my knowledge, none of the load binders were changed on this particular trailer during the period of time following this incident, although I did not drive this trailer on a regular basis."  Mendonca Aff. ¶ 15.  This statement is also insufficient to raise a genuine issue of material fact for several reasons.  First, it is vague as to the "period of time following the incident."  There is nothing in Mr. Mendonca's Affidavit that expressly or implicitly indicates that he is referring to the two years and four month period between the November 12, 2001 accident and the March 11, 2004 inspection.  Second, Mr. Mendonca's Affidavit admits of no personal knowledge regarding Mr. Aiello's trailer (i.e., "I did not drive this trailer on a regular basis").  Thus, his statement cannot be used to oppose summary judgment.  See FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge . . . ").

The parties dispute whether the load binder involved in the accident was placed back on the trailer and returned to Portland on the day of the accident.  On one hand, Mr. Zanto testifies that "Mergenthaler does not know if the load binder that may have injured [Mr. Aiello] was put back on the trailer M-44 in Everett, Washington or if the load binder was

ORDER -17-

returned with trailer M-44 or any other Mergenthaler trailer to Portland." Zanto Decl. ¶ 7. On the other hand, Mr. Barcus testifies that "The load binder that injured Mr. Aiello was placed back on the trailer, or in the box that held the chain binders on the side of the truck." Barcus Aff. ¶ 17.  And Mr. Mendonca similarly testifies that "the load binder that struck Mr. Aiello had either been placed back in the side bin with doors on it or on the trailer" and that he "did return all the load binders to the side bin upon completion of the job upon any return to Portland, or left them on the side of the trailer." Mendonca Aff. ¶¶ 8, 15.  Although this fact is disputed, it is not a material fact.  Taking the evidence in the light most favorable to the non-moving party, the Court assumes for the purposes of this motion that the load binder involved in the accident was placed back on the trailer or in the side bin of the trailer in Everett, Washington and returned to Portland, Oregon on the day of the accident.

The problem for Plaintiffs is that they cannot demonstrate whether that load binder, and the other load binders present on Mr. Aiello's trailer on the day of the accident, remained on the trailer until the March 11, 2004 inspection.  In the absence of any evidence connecting the composition of the load binders on the day of the accident to the composition on the day of the inspection, Plaintiffs have failed to raise a genuine issue of material fact that they have joined all potential tortfeasor manufacturers.

### E. Loss of Consortium Claim

"Plaintiffs agree [with Defendants] that if plaintiffs' alternate-liability negligence claim is dismissed, then plaintiff Karen Aiello's loss of consortium claim must fail." Pls.' Opp'n at 14.  Because summary judgment is granted for Defendants as to Mr. Aiello's alternate liability-negligence claim, the Court also GRANTS Defendants' Motion for Summary Judgment as to Mrs. Aiello's loss of consortium claim.

## III. CONCLUSION

The Court GRANTS Defendants' Joint Motion for Summary Judgment, docket no. 50, and DISMISSES with prejudice all of Plaintiffs' claims.

ORDER  -18-

IT IS SO ORDERED.

DATED this 28th day of September, 2006.

_____
Thomas S. Zilly
United States District Judge

ORDER  -19-